UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UPSTATE CITIZENS FOR EQUALITY,
INC., DAVID VICKERS, RICHARD
TALLCOT, SCOT PETERMAN, DANIEL
T. WARREN,

                              Plaintiffs,

        v.                                              5:08-CV-0633 (LEK/DEP)

KENNETH SALAZAR, in his official capacity
as Secretary of the U.S. Department of the
Interior, P. LYNN SCARLETT, in her official
capacity as Deputy Secretary of the U.S.
Department of the Interior,  JAMES E. CASON,
in his official capacity as the Associate Deputy
Secretary of the Interior, PHILLIP N. HOGAN,
in his capacity as Chairman of the National Indian
Gaming Commission, ERIC HOLDER, in his
capacity as Attorney General of the United States,
THE UNITED STATES OF AMERICA, UNITED
STATES DEPARTMENT OF THE INTERIOR,
NATIONAL INDIAN GAMING COMMISSION.

                              Defendants.

_____


**MEMORANDUM-DECISION AND ORDER**


**I.      INTRODUCTION**

        Presently before the Court are Motions to dismiss certain claims (Dkt. No. 23)  in Plaintiffs'

initial Complaint (Dkt. No. 1), and to dismiss (Dkt No. 45) Plaintiffs' Supplemental Claim (Dkt.

No. 35).  The Court shall address these Motions in turn.

                                              1

## II.     BACKGROUND[1]

The instant action, composed of a variety of challenges to government conduct as well as the

operation of gambling facilities in Verona, New York, arises primarily from a May 20, 2008

decision by the Department of Interior ("DOI") to accept into trust approximately 13,000 acres of

land for the Oneida Indian Nation of New York ("OIN").  Following that final decision, Plaintiffs

brought a number of legal challenges on June 16, 2008.  Defendants moved for partial dismissal on

October 24, 2008.  Subsequently, on January 29, 2009, Plaintiffs filed a Supplemental Claim raising

a separate challenge to the DOI's acceptance of custody of 18 acres of excess federal land in trust

for the OIN pursuant to a mandatory transfer from the General Services Administration ("GSA").

Defendants moved to dismiss this claim on April 13, 2009.

The Plaintiff group is comprised of: Upstate Citizens for Equality, Inc. ("UCE"), a citizens

group, David Vickers, Richard Tallcot, Scott Peterman, and Daniel T. Warren.  The named

Defendants are: Kenneth Salazar, Secretary of the Department of Interior;[2] P. Lynn Scarlett, Deputy

---

[1]The above-captioned case is one of several filed in this Court by different plaintiffs raising challenges to various aspects of the DOI's May 20, 2008 Record of Decision. See 5:08-CV-633; 6:08-CV-644; 5:08-CV-648; 5:08-CV-649; 6:08-CV-647. These cases represent only the latest chapter in a long saga of litigation involving the Oneida Indian Nation of New York's ("OIN") land claims in New York.  For a more detailed historical background of the OIN and this litigation, see, e.g., the Supreme Court's opinion in City of Sherrill, New York v. Oneida Indian Nation of New York, 544 U.S. 197 (2005); the Second Circuit's opinion in Oneida Indian Nation of New York v. City of Sherrill, New York, 337 F.3d 139 (2d Cir. 2003) (reversed by the Supreme Court in Sherrill); or this Court's opinions in New York v. Salazar, No. 6:08-CV-644, 2009 U.S. Dist. LEXIS 90071 (N.Y.N.D. Sept. 29, 2009), Oneida Indian Nation of New York v. New York, 500 F. Supp. 2d 128 (N.D.N.Y. 2007), and Oneida Indian Nation of New York v. New York, 194 F. Supp. 2d 104 (N.D.N.Y. 2002).

[2]On January 20, 2009, Kenneth Salazar was confirmed as the Secretary of the United States Department of the Interior and, therefore, replaces Dirk Kempthorne as a Defendant in this action pursuant to Federal Rule of Civil Procedure 25(d). See FED. R. CIV. P. 25(d).

Secretary of the Department of Interior; James Cason, Deputy Secretary of the Interior; Philip N.

Hogen, Chairman of the National Indian Gaming Commission; Eric H. Holder, Attorney General of

the United States;[3] the National Indian Gaming Commission, the United States Department of the

Interior; and the United States of America.

A vast and complicated historical record informs the factual background of the instant

action.  As the Supreme Court stated, the "OIN is a federally recognized Indian Tribe and a direct

descendant of the Oneida Indian Nation (Oneida Nation), 'one of the six nations of the Iroquois, the

most powerful Indian Tribe in the Northeast at the time of the American Revolution'"  City of

Sherrill v. Oneida Indian Nation of New York, 544 U.S. 197, 203 (2005), though its population,

land holdings and status have fluctuated significantly since that time.  See id. at 203-210 (discussing

the series of treaties and relations between Oneida Indians and federal and state governments from

the Colonial Era until the present, including related litigation efforts).

In the context of Plaintiffs' action, it is unnecessary for this Court to broadly recount

developments in federal policy towards the land and status of the Oneidas of New York, other than

to note that Congress eventually, through enactment of the Indian Reorganization Act ("IRA") in

1934, "provided a mechanism for the acquisition of lands for tribal communities that takes account

of the interests of others with stakes in the area's governance and well-being."  Id. at 220; 25 U.S.C.

§ 465.  With the objective of increasing the self-government of Indian tribes, both in political and

economic affairs, the IRA authorized the Secretary of the Interior ("the Secretary"), following

consideration of relevant interests, to take land into trust for Indian tribes, such that the land would

---

[3]On February 2, 2009, Eric H. Holder was confirmed as the Attorney General of the United
States and, therefore, replaces Michael Mukasey as a Defendant in this action pursuant to Federal
Rule of Civil Procedure 25(d).  See FED. R. CIV. P. 25(d).

become exempt from local and state taxation.  See Morton v. Mancari, 417 U.S. 535, 542 (1942);

Sherrill, 544 U.S. at 220-221.  The land-into-trust action challenged by Plaintiffs' initial Complaint

was undertaken on this basis, pursuant to § 465 of the IRA.  After Sherrill, in which the Court held

that § 465 "provides the proper avenue for OIN to reestablish sovereign authority over territory last

held by the Oneidas 200 years ago," the OIN sought to have the Secretary of the Interior take

approximately 17,300 acres of land in New York State into trust under that section.  Sherrill, 544

U.S. at 221.  On May 20, 2008, after the necessary procedural steps and consideration of

alternatives, the DOI accepted approximately 13,000 acres into trust for the OIN.  Plaintiffs' suit

followed.

    In a separate action, and under a separate provision of the United States Code, 40 U.S.C. §

523(b)(1), the DOI acknowledged custody of an approximately 18 acre parcel of land in trust for the

use and benefit of the OIN, which was transferred by the General Services Administration in a May

28, 2002 letter after having been classified as excess federal land within the boundaries of an Indian

reservation.  By § 523, Congress directed that "[t]he Administrator of General Services shall

prescribe procedures necessary to transfer to the Secretary of the Interior, without compensation,

excess real property located within the reservation of any group, band, or tribe of Indians that is

recognized as eligible for services by the Bureau of Indian Affairs" and that "the Secretary shall

hold excess real property transferred under this section in trust for the benefit and use of the group,

band, or tribe of Indians, within whose reservation the excess real property is located."  40 U.S.C. §

523(a), (b).  The 18 acre parcel was used by the United States as part of the Verona Test Site, an

annex to the Griffiss Air Force Base.  The Air Force vacated the Verona Test Site in 1996 and, on

January 23, 2001, issued a Report of Excess Real Property for the parcel contained on the Site.

4

After receiving notice from the DOI that the parcel lay within the boundaries of the OIN's reservation circa 1794, set by the Treaty of Canandaigua, the GSA made the transfer, which the DOI formally acknowledged on December 30, 2008.  Plaintiffs' Supplemental Claim followed.

Defendants move to dismiss Plaintiffs' attacks on the constitutionality of the DOI's trust determination as to the approximately 13,000 acres on behalf of the OIN and on the validity of the § 523 transfer of the 18 acres from the GSA.  Additionally, Defendants move to dismiss assorted challenges by Plaintiffs relating to the operation of the Turning Stone Casino in Verona, NY by the OIN that appear in Plaintiffs' Complaint.  Based on their contestation of the DOI's land into trust determination, as well as based on allegedly independent grounds, Plaintiffs raise challenges to the Casino's compliance with the Indian Gaming Regulatory Act ("IGRA") and to what they argue is a final agency action by the DOI in the form of a letter by Defendant Cason stating that the DOI was declining to further reconsider the DOI's 1993 approval of a gaming compact between the OIN and New York State.  Further, Plaintiffs assert a challenge to the National Indian Gaming Commission's 1994 approval of the OIN's gaming ordinance.  Plaintiffs also bring a claim which seeks to require the government to implement and enforce IGRA as to the United States generally or the OIN's facility in particular.  25 U.S.C. §§ 2701-2721.  Defendants seek to dismiss each of these claims.

## III.    DISCUSSION

### A.  Standard of Review

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a motion to dismiss

pursuant to Rule 12(b)(6), a district court must accept the allegations made by the non-moving party

as true and "draw all inferences in the light most favorable" to the non-moving party.  In re NYSE

Specialists Sec, Litig,, 503 F.3d 89, 95 (2d Cir. 2007).  "The movant's burden is very substantial, as

'[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is

entitled to offer evidence to support the claims.'"  Log On America, Inc. v. Promethean Asset

Mgmt. L.L.C., 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting Gant v. Wallingford Bd. of

Educ., 69 F.3d 669, 673 (2d Cir. 1995) (internal quotation and citations omitted)).  Pursuant to

Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter

jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it."

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing FED. R. CIV. P. 12(b)(1)).  "A

plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the

evidence that it exists."  Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d

Cir. 1996)).  In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court "'must

accept as true all material facts alleged in the complaint and draw all reasonable inferences in the

plaintiff's favor.'"  Sharkey v. Quarantillo, 541 F.3d 75, 83 (2d Cir. 2008) (quoting Merritt v.

Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001)).  A defendant's challenge to a plaintiff's

constitutional standing to sue is properly brought under Rule 12(b)(1).  See Alliance for

Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 89 n.6 (2d Cir. 2006)

("Although we have noted that standing challenges have sometimes been brought under Rule

12(b)(6), as well as Rule 12(b)(1) . . . the proper procedural route is a motion under Rule 12(b)(1).")

(internal citations omitted).

**B. First and Second Claims**

Defendants seek to dismiss those portions of Plaintiffs' Complaint, located in Plaintiffs'
First and Second Claims, that challenge § 465 of the IRA, and the Secretary's land into trust
determination pursuant to that section, as an unconstitutional delegation of legislative authority.
Plaintiffs argue that the Secretary's fee-into-trust land determination was made in excess of the
authority actually delegated in the statute.  The thrust of Plaintiffs' argument is that the statute either
has no intelligible standards by which the Secretary's action can be held to the will of Congress, or
that the text of the statute, by authorizing an annual federal expenditure of two million dollars to
purchase land to be taken in trust, expressed the intent that only lands obtained through that limited
expenditure, as opposed to lands owned in fee or land available through any other means, could
become trust lands under the statute.  Based on this premise, Plaintiffs conclude that § 465 has no
limiting principle.  Such a challenge to the Secretary's trust determination under the provisions of
the IRA must be rejected as contrary to the text of IRA and without a basis in law.

Article I, § 1, of the Constitution vests "all legislative powers herein granted . . . in a
Congress of the United States."  U.S. CONST. art. I, § 1.  Accordingly, Congress "is not permitted to
abdicate, or to transfer to others, the essential legislative functions with which it is vested."  Panama
Refining Co. v. Ryan, 293 U.S. 388, 421 (1935); see also Whitman v. Am. Trucking Ass'ns, 531
U.S. 457, 472 (2001); Mistretta v. United States, 488 U.S. 361, 371 (1989) ("The non-delegation
doctrine is rooted in the principle of separation of powers that underlies our tripartite system of
government.").  However, the Supreme Court has recognized that "Congress simply cannot do its
job absent an ability to delegate power under broad general directives" and therefore Congress may
confer decision making authority on agencies.  Mistretta, 488 U.S. at 372.  "[W]hen Congress

7

confers decision-making authority upon agencies, Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to perform.'" Whitman, 531 U.S. at 472 (quoting J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)).  The Supreme Court "has deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'"  Mistretta, 488 U.S. at 372-73 (quoting Am. Power & Light Co. v. SEC, 328 U.S. 90, 105 (1946)).  Indeed, the Court has stated that it has "almost never felt qualified to second-guess Congress regarding permissible degrees of policy judgment that can be left to those executing or applying the law."  Whitman, 531 U.S. at 474-75.

Essentially every court to consider a non-delegation challenge to § 465 has rejected it and found that agency regulations sufficiently limit the Secretary of the Interior's discretion.  See, e.g., Michigan Gaming Opposition v. Kempthorne, 525 F.3d 23, 33 (D.C. Cir. 2008); Carcieri v. Norton, 497 F.3d 15, 43 (1st Cir. 2007) (en banc), rev'd on other grounds sub nom. Carcieri v. Salazar, ___ U.S. ___, 129 S. Ct. 1058 (2009); South Dakota v. United States Dep't of Interior, 423 F.3d 790, 799 (8th Cir. 2005) ("South Dakota II");[4] United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir. 1999); Shivwitz Band v. Utah, 428 F.3d 966, 972-74 (10th Cir. 2005); Nevada v. United States, 221 F. Supp. 2d 1241, 1250-51 (D. Nev. 2002).

Review of the IRA makes clear why it does not involve an unconstitutional delegation of legislative authority.  The statutory preamble describes the IRA as "[a]n Act to conserve and

---

[4]In South Dakota v. United States Dep't of Interiors, 69 F.3d 878 (8th Cir. 1995), the Eighth Circuit held that Section 465 was an unconstitutional delegation of legislative power because "providing land for Indians" did not provide an intelligible standard.  However, the Eighth Circuit reversed its holding en banc in South Dakota II.

develop Indian lands and resources."  48 Stat. 984 (1934).  Thus, "an intelligible principle exists in

the statutory phrase 'for the purpose of providing land for Indians' when it is viewed in the statutory

and historical context of the IRA."  Michigan Gaming Opposition, 525 F.3d at 31 (quoting 25

U.S.C. § 465).  "This principle involves providing lands sufficient to enable Indians to achieve self-

support and ameliorating the damage resulting from . . . prior federal policy."  Id. (internal citations

and quotations omitted).  Therefore, this Court, consistent with those federal courts to have

considered the question, finds no impermissible delegation of legislative authority within the statute.

Plaintiffs contend, nonetheless, that an unconstitutional delegation occurs because the statute

permits the Secretary to take land into trust that was not strictly purchased with the two million

dollars in federal funds allocated for precisely that purpose.  The relevant portion of the statute

provides:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through
> purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water
> rights, or surface rights to lands, within or without existing reservations, including trust
> or otherwise restricted allotments, whether the allottee be living or deceased, for the
> purpose of providing land for Indians.
> For the acquisition of such lands, interests in lands, water rights, and surface
> rights, and for expenses incident to such acquisition, there is authorized to be
> appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not
> to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be
> used to acquire additional land outside of the exterior boundaries of Navajo Indian
> Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that
> legislation to define the exterior boundaries of the Navajo Indian Reservation in New
> Mexico, and for other purposes, or similar legislation, becomes law.

25 U.S.C. § 465.

In essence, Plaintiffs argue that the intelligible principle that guides the Secretary's authority

to take land into trust is Congress' allotment of the two million dollar amount.  Such a view is

inconsistent with the statute and, implicitly, the views of the federal courts that have examined the

statute.  First, the statute provides for means other than the allotment of federal funds to take land into trust.  Second, as discussed above, the IRA's intelligible principle, which has been found sufficient to pass constitutional muster, is that of providing Indians with lands to enable self-support and mitigate the harms of past policies.  The Congressional allotment simply does not, and need not, impose the element of guidance that prevents § 465 from allowing unlimited discretion on the part of the Secretary, for that element is found elsewhere in the statute.  As the Eighth Circuit wrote in response to similar assertions:

> The State argues that these claimed textual limitations are artificial because any acquisition could be seen as "for Indians," regardless of who else it harms.  Likewise, because most of the land currently taken into trust has been previously purchased by a tribe, the limit on appropriated funds for purchasing land is irrelevant.  We disagree that these limitations were meaningless when the IRA was enacted, and we conclude that the context of the entire act and its legislative history continue to give meaning to the phrase "for the purpose of providing land for Indians."

South Dakota II, 423 F.3d at 798.

The argument that Defendants have unreasonably applied their delegated power is, of course, quite different than the argument that the delegation directed by a statute lacks constitutionally adequate guidance.  The Court addresses here only the Plaintiffs' non-delegation claim, per the Motion to dismiss brought by Defendants.  For the reasons given above, the portion of Plaintiffs' challenge to the fee-to-trust action of the Secretary which is predicated on non-delegation grounds shall be dismissed.

### C. Fourth and Fifth Claims

In their Fourth and Fifth Claims, Plaintiffs raise challenges to the DOI's land into trust determination, alleging violations of IGRA and seeking review pursuant to the APA.  See 5 U.S.C.

§ 702. Each challenge, in attempting to set aside the trust decision, rests upon a predicate argument as to the legal status of the Turning Stone Casino and the DOI's obligations with respect to the status of the gaming facility in rendering its decision.

Plaintiffs' Fourth Claim asserts that "Defendants' decision to take land into trust without ensuring that there will never be illegal gambling at the site violates the law and the applicable standard of review under the APA."  Compl. at 44.  The argument advanced by Plaintiffs in this claim suggests that, because the OIN are alleged to not have a valid tribal-state compact for the Turning Stone Casino that would enable them to lawfully conduct Class III gaming[5] under IGRA, the decision to take the land into trust, which includes the land upon which the Turning Stone Casino sits, must be set aside as arbitrary, capricious or otherwise not in accordance with law. Thus, Plaintiffs necessarily argue that the DOI may not take land into trust without first resolving any issues that may exist with regard to alleged unlawful gaming.

Plaintiffs' Fifth Claim asserts that the land into trust decision must be set aside because "Defendants have violated the statutory procedures mandated by IGRA §§ 2710, 2719 for permitting gambling without a tribal-state compact on Indian lands acquired after October 17, 1988."  Compl. at 46.  Substantially similar to the Fourth Claim, this argument suggests that because Turning Stone does not comply and the DOI did not undertake certain procedures in compliance with certain provisions of IGRA, the trust decision may be found to be "without observation of procedure[s] required by law" or "not in accordance with the law" under the APA.

---

[5]Class III gaming is defined in IGRA as "all forms of gaming that are not class I gaming or class II gaming[,]" 25 U.S.C. § 2703(8), and "includes such things as slot machines, casino games, banking card games, dog racing, and lotteries." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 48 (1996).

Compl. at 50.  Both the Fourth and Fifth Claims are without merit; therefore, they are dismissed.

IGRA establishes the requirements for lawful Class III gaming on Indian lands.  See 25 U.S.C. § 2710(d).  IGRA defines "Indian lands" as including, *inter alia*, "all lands within the limits of any Indian reservation[.]" 25 U.S.C. § 2703(4)(A).  Section 2719 provides, in relevant part, that:

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless–
    (1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; or

* * *

(b) Exceptions
    (1) Subsection (a) of this section will not apply when–

        (A) the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

* * *

(c) Authority of Secretary not affected

Nothing in this section shall affect or diminish the authority and responsibility of the Secretary to take land into trust.

25 U.S.C. § 2719.

Plaintiffs' IGRA claims must be dismissed because the Turning Stone Casino is within the boundaries of the OIN reservation, and thus the procedures required by 25 U.S.C. § 2719(b)(1)(A) do not apply.  In Oneida Indian Nation, through a series of consolidated cases, the OIN brought suit

against the City of Sherrill and Madison County, New York, alleging that properties once part of the OIN's ancestral land that OIN members had reacquired on the open market were within the OIN reservation and therefore not subject to taxation.  The Second Circuit held, *inter alia*, that the OIN reservation, as recognized by the 1794 Treaty of Canandaigua, has never been disestablished, and that therefore the lands were not subject to taxation.  337 F.3d at 160-65, 167 ("Construing the Buffalo Creek Treaty liberally and resolving, as we must, all ambiguities in the Oneidas' favor, we conclude that neither its text nor the circumstances surrounding its passage and implementation establish a clear congressional purpose to disestablish or diminish the OIN reservation.").

In Sherrill, the Supreme Court reversed and remanded, holding that "'standards of federal Indian Law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." 544 U.S. at 214.  The Supreme Court noted how the "long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude OIN from gaining the disruptive remedy it now seeks."  Sherrill, 544 U.S. at 216-17.  However, the Supreme Court noted that it "need not decide today whether, contrary to the Second Circuit's determination, the 1838 Treaty of Buffalo Creek disestablished the Oneida's reservation, as Sherrill argues."  Id. at 216 n.9.

The Second Circuit's holding in Oneida Indian Nation that the OIN reservation has not been disestablished remains binding precedent on this Court.  In Oneida Indian Nation of New York v. Madison County, 401 F. Supp. 2d 219 (N.D.N.Y. 2005) (Hurd, J.), Madison County unsuccessfully argued that relying upon the Second Circuit's holding that the Oneida reservation was not disestablished is contrary to the Supreme Court's decision in Sherrill.  Judge Hurd concluded that,

13

because the Supreme Court "explicitly declined to decide whether the Second Circuit erred in determining that the reservation was disestablished . . . the Second Circuit holding that the reservation was not disestablished remains undisturbed." Oneida, 401 F. Supp. 2d at 231.

This Court agrees that the Second Circuit's holding remains good law. In Sherrill, the Supreme Court not only expressly declined to address the Second Circuit's determination that the OIN reservation had not been disestablished, but also noted that "'only Congress can divest a reservation of its land and diminish its boundaries.'" 544 U.S. at 216 n.9 (quoting Solem v. Bartlett, 465 U.S. 463, 470 (1984) (other citations omitted)); see Solem, 465 U.S. at 470 ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."). Congress has not divested the OIN of its reservation. Therefore, the Turning Stone Casino is "located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988." 25 U.S.C. § 2719(a).

Because the provisions of 25 U.S.C. § 2719(b)(1)(A) do not apply, Plaintiffs' IGRA claims must be dismissed to the extent that challenge the trust decision based on an alleged failure to comply with the IGRA provisions governing the taking of land into trust where Class III gaming is conducted. Plaintiffs' Fourth Claim may be understood as redundant with the Fifth Claim, the latter of which is squarely dismissed for the foregoing reasons; however, the Fourth Claim may rest its challenge to the trust decision on an independent attack on the lawfulness of the operation of the Turning Stone Casino under IGRA and the further contention that this alleged unlawfulness serves to invalidate the DOI's trust decision. This line of argument is baseless and must be dismissed.

Even assuming *arguendo* that there is not a valid tribal-state compact between the OIN and

New York State authorizing the Turning Stone Casino in conformance with § 2710(d)(1)(C) of IGRA, as alleged by Plaintiffs, that fact does not provide any basis on which to challenge the DOI's trust decision under the APA.  Plaintiffs do not state a claim for which relief can be granted because the existence of a gaming establishment not in compliance with IGRA on land under trust consideration need not have any impact on the DOI's decision.  That is, because there is no requirement that the DOI either refuse to take land on which an allegedly invalid gambling facility is already located, or to take steps to "ensur[e] that there will never be illegal gambling" with respect to an existing establishment, it is impossible for Plaintiffs to prevail on an argument that the Secretary's determination must be set aside as arbitrary, capricious or otherwise not in accordance with law. Plaintiffs' claim challenges the DOI's final agency action of taking land into trust for the OIN, not the validity of OIN's 1993 compact, and Plaintiffs cannot explain how the trust action either directly implicates IGRA or otherwise requires the Secretary to ensure that all trust land be free of alleged legal defects under IGRA.  Quite simply, whether or not Turning Stone Casino is in compliance with IGRA is a wholly separate issue from whether the DOI's trust action is lawful. Plaintiffs may not maintain a challenge to the lawfulness of the casino in the guise of an attack on the Secretary's land into trust decision pursuant to 5 U.S.C. § 702.  Accordingly, Plaintiffs' Fourth Claim is dismissed.

**D.  Sixth Claim**

Plaintiffs' Sixth Claim asserts that the DOI rendered a final agency action on June 13, 2007, when Defendant Cason distributed a letter informing the OIN and New York State that the DOI would not reconsider its approval of the parties' gaming compact.  Plaintiffs contend this action may be reviewed pursuant to 5 U.S.C. § 704 and should be found arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Conversely, in moving to dismiss this claim,

Defendants argue that the letter is not a final agency action, and therefore it does not constitute an action subject to the review under the APA.  The Court finds that the letter is not a final agency action subject to review on its merits, and the claim must be dismissed.

While the OIN obtained a gaming compact with New York State pursuant to IGRA in 1993, it was ruled defective by a 2004 state court decision on the ground that the Governor lacked authority to enter it on behalf of the State.  See Peterman v. Pataki, 798 N.Y.S. 2d 347 (N.Y. App. Div. 2004).  In March 2007, the DOI contacted the OIN and State, noting that the DOI would reconsider the compact, requesting comments on that reconsideration, and indicating that reconsideration would be suspended if the parties chose to negotiate a new compact.  On June 13, 2007, however, Defendant Cason released a brief letter stating that reconsideration was suspended, as both parties had expressed opposition to reconsideration, and that therefore the existing compact remained in effect.  It is on these facts that Plaintiff seeks to challenge the letter as a final agency action, such that the Court should compel Defendants to reconsider the compact.

The APA provides for judicial review under 5 U.S.C. § 704 of final agency actions, where an agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Finality arrives through the nature and juncture of the agency action.  "As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process--it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).  For Plaintiffs to properly bring a challenge under § 704, Defendant Cason's letter must

16

meet both of these conditions.

The Court finds that the letter does not represent the end of the DOI's decisonmaking process, and it does not impact any range of legal right or obligations. Effectively, the letter is simply a statement that agency action will not be taken on a particular matter. In N.Y. Dock Ry. v. United States, 696 F.2d 32, 34 (2d Cir. 1982), the Second Circuit held that no final order had been made, and hence the court did not have subject matter jurisdiction to hear the petitioners' claim, where the Interstate Commerce Commission stated that it could not reach a majority decision on a rate issue, was terminating its investigation, and therefore the pre-investigation rates would remain in place.[6] The DOI letter is even less a final agency action than the challenged ICC conduct in N.Y. Dock Ry.: it does not deny a request to take action, so that neither of the parties to the compact are arguably injured, the stage at which the reconsideration ceased is earlier than the stage at which the ICC investigation was abandoned, and, whereas the ICC reached and disagreed on the merits of the rate issue, the letter does not indicate that substantive judgments were ever made as to the compact issue. The Supreme Court has stated that if an agency issues a "definitive statement of its position, determining the rights and obligations of the parties," a Court should review the agency's action as final, notwithstanding "[t]he possibility of further proceedings in the agency." Bell v. New Jersey, 461 U.S. 773, 779-80 (1983) (analogizing between the order at issue to "the ordinary adjudication by a trial court [where] a plaintiff has a right to damages"). Thus, at the very least, the letter must be a

_____

[6]The Second Circuit heard the case pursuant to the courts of appeals having been vested with exclusive jurisdiction to determine the validity of final orders of the ICC, pursuant to 28 U.S.C. §§ 2321(a), 2342(5) (1976 & Supp. IV 1980). Thus, while N.Y. Dock Ry. is instructive, it is readily distinguishable on this basis.

definitive articulation of the DOI's view on the compact to be a final action, and no such position may be found in the letter; all that can be gleaned is that the DOI has ceased to consider a question it had raised some months earlier.

To justify their challenge, Plaintiffs cite to the principle that "[i]f for any reason the agency reopens a matter and, after reconsideration, issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision." Sendra Corp. v. Magaw, 111 F.3d 162 (D.C. Cir. 1997). This statement in inapplicable to the facts of the instant claim, where it is clear that the DOI never completed reconsideration of the compact and where a new and final order never issued. Moreover, just as the June 13, 2007 letter was not the consummation of the DOI's decisionmaking process; the letter did nothing more than decline to consider changing the status quo. Accordingly, it is not possible for Plaintiffs to argue that "a judgment previously entered has been revised as to substantive matters, or . . . a genuine ambiguity [resolved, such that] the practical effect is to render the latter decision final for purposes of review." G. & T. Terminal Packaging Co. v. Hawman, 870 F.2d 77, 80 (2d Cir. 1989) (citation omitted). The Court finds that, in the absence of both a fulfilled decisonmaking process and a determination of legal obligations, other than the default effects of the DOI suspending its reconsideration of the compact, Plaintiffs' claim must be dismissed.

Even if the letter were to be reviewed as a final agency action, the Court would be compelled to dismiss Plaintiffs' claim for lack of standing. "[T]he threshold issue of standing [is] 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" Horne v. Flores, ___ U.S. ___, 129 S. Ct. 2579, 2592 (2009) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Constitutional standing requires a showing of three elements: "(1) *injury-in-fact*, which is a

'concrete and particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP, 549 F.3d 100, 106-07 (2d Cir. 2008) (emphasis in original) (citing Defenders of Wildlife, 504 U.S. at 560-61). Plaintiffs do not meet any of these three essential elements. Assuming that the operation of the casino were a valid injury, that injury was incurred by the initial approval of the compact more than a decade before the June 17, 2007 letter. Logically, then, the letter is not the cause of Plaintiffs' injury, and an order in Plaintiffs' favor requiring that the DOI to resume reconsideration of the compact would not redress the injury of the casino's continued operation. It is entirely speculative whether, given such a order in Plaintiffs' favor, the compelled DOI reconsideration process would result in an outcome that removed the alleged harm of the continued operation of the casino; given that both parties declined to upset the existing compact and that the DOI appears to have no interest in pursuing the matter further, the Court finds there to be no "non-speculative likelihood that the injury can be remedied by the requested relief." Id.

Plaintiffs' Sixth Claim appears to contain a direct challenge to the January 3, 1994 NIGC approval of the OIN's gaming ordinance. Defendants move to dismiss this claim on the ground that the statute of limitations has long run on such challenge. Under 28 U.S.C. § 2401(a), civil actions against the United States, barring tolling and certain exceptions, must be filed within six years after the right of action accrues. Accrual occurs when a plaintiff knows, or has reason to know, of the injury that forms the basis of the action, Leon v. Murphy, 988 F.2d (2d Cir. 1993), or upon the date when an agency action is final, Sendra Corp., 111 F.3d at 165. Claims made pursuant to the APA

are within the scope of the general limitations period in § 2401(a).  See Polanco v. U.S. Drug

Enforcement Admin., 158 F.3d 647, 654 (2d Cir. 1998) (construing claim that DEA failed to comply

with its own forfeiture procedures as a challenge to agency action and holing that holding that it is

governed by the six-year catch-all statute of limitations).

In the instant case, Plaintiffs allege that Defendants Hogen and NIGC "failed to make an

Indian lands determination prior to approval of the Oneida Indian Nation's Gaming Ordinance dated

January 3, 1994" and their "determination approving a gaming ordinance permitting gaming under a

tribal-state compact that is not lawfully in effect as required by 25 U.S.C. § 2710(d)(1)(C) because

the State Defendants did not have the authority under state law to enter into it."  This alleged injury

accrued when it became final in 1994, such that the statute of limitation ran on the claim by the end

of 2000.  Plaintiffs do not present a valid or persuasive reason for why a different accrual date or

equitable tolling should apply.  Contrary to Plaintiffs' contentions, the Sherrill opinion has no

bearing on the actual accrual of the cause of action they seek to advance at present.  Likewise,

Plaintiffs provide no indication of "extraordinary circumstances" that prevented timely filing and no

showing of "reasonable diligence" during the tolling period sought, as are required to obtain tolling.

Accordingly, to the extent that Plaintiffs raise a direct challenge to the January 3, 1994 NIGC

approval of the OIN's gaming ordinance, that claim is dismissed.


**E.  Seventh Claim**

Defendants move to dismiss Plaintiffs' Seventh Claim, which seeks a writ of mandamus

"compelling Defendants to carry out their statutory duties" based on general allegations of non-

implementation and non-enforcement of Indian gaming laws and regulations.  Compl. at 53.  In

Response to Defendants' Motion asserting that Plaintiffs lack standing and fail to state claim,

Plaintiff make a somewhat narrower claim, limiting their request for the Court to compel Defendants

to take enforcement actions against Turning Stone Casino on the basis of the alleged unlawful status

of the Casino and Defendants' statutory duties.  Neither the broader nor the narrower version of

Plaintiffs' claim can survive Defendants' Motion, however, and the claim must be dismissed.

Plaintiffs predicate their claim for relief on 28 U.S.C. § 1361, which authorizes a district

court to issue relief in the nature of a writ of mandamus to compel action by an officer or employee

of the United States where a the named defendant necessarily owes a duty to the plaintiff.[7]  The duty

must be clear and non-discretionary.  Anderson v. Bowen, 881 F.2d 1, 5 (2d Cir. 1989) ("The

prerequisites for issuance of a writ of mandamus are peremptory: (1) a clear right in the plaintiff to

the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act

in question; and (3) no other adequate remedy available.") (quotation and citation omitted).  "Courts

have held that section 1361 does not by itself operate as a waiver of sovereign immunity."  Pieczenik

v. Cambridge Antibody Tech. Group, No. 3-CV-6336, 2004 U.S. Dist. LEXIS, *13-16 (S.D.N.Y.

May 19, 2004) (listing cases in the Fist, Tenth, Ninth and D.C. Circuits holding that the mandamus

statue does not waive sovereign immunity).  This rule is not without exception, however.  "Where

the officer's powers are limited by statute, his actions beyond those limitations are considered

individual and not sovereign actions . . . . His actions are *ultra vires* his authority and therefore may

be made the object of specific relief."  Larson v. Domestic & Foreign Commerce Corp., 337 U.S.

682, 689 (1949); see also Dugan v. Rank, 372 U.S. 609, 621-22 (1963).  Thus, to establish waiver of

---

[7]Section 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

sovereign immunity, Plaintiffs must allege the existence of a duty owed to them by the United States which the Defendants failed to perform.  Upon review of Plaintiffs' claim, it is evident that the mandamus statute, cannot provide the relief that Plaintiffs seek because Plaintiffs do not meet the prerequisites for a writ to issue.  They can neither demonstrate the existence of a definite, non-discretionary duty by Defendants to take the enforcement actions Plaintiffs seek, and nor can they demonstrate a clear right to the relief sought.

Plaintiffs argue that "Defendants Hogan and the NIGC have a non-discretionary duty to issue a Notice of Violation" and "upon receipt of information that indicates a violation of Federal law, to investigate the activities associated with gaming authorized by [IGRA]" and that the Attorney General "similarly has a duty. . . to investigate the activities associated with gaming authorized by [IGRA]."  Response at 14 (Dkt. No. 27).  Plaintiffs rely primarily on Citizens Against Casino Gambling in Erie County v. Hogan ("CACGEC") to establish their claim.  No. 07-CV-0451S, 2008 U.S. Dist. LEXIS 67743 (W.D.N.Y. Aug. 26, 2008).  Review of this case, however, reveals that it is inapposite, and its distinguishing characteristics highlight why Plaintiffs' claim must fail.

CACGEC and the heart of Plaintiffs' mandamus claim rests upon the presence of certain mandatory language in IGRA concerning enforcement.  Per the instructions of 25 U.S.C. §§ 2705 and 2706, the NIGC is charged with the enforcement of IGRA, such that the NIGC must promulgate regulations and guidelines it deems appropriate to implement the Act.  Consistent with the enforcement provisions in 25 U.S.C. § 2713, the Chairman of the NIGC may collect fines for any violation of the IGRA or its regulations, as well as order the temporary closure of a gaming facility for a major regulatory violation.  Yet IGRA employs mandatory language in discussing the triggering of enforcement action on the part of the NIGC, stating, in relevant part, as to the provision of a

Notice of Violation:

> *Whenever* the Commission has reason to believe that the tribal operator of an Indian game . . . is engaged in activities regulated by this chapter . . . that may result in the imposition of a fine under subsection (a)(1) of this section [or] the permanent closure of such game . . . the Commission *shall* provide such tribal operator . . . with a written complaint stating the acts or omissions which form the basis for such belief and the action or choice of action being considered by the Commission.

25 U.S.C. § 2713(a)(3).  Based upon this language, the <u>CACGEC</u> court found that "Congress directs the NIGC to act upon any indication of the existence of a violation; it does not give the Commission discretion to ignore violations or choose not to issue a complaint."  2008 U.S. Dist. LEXIS 67743, at *9-10.  However, "Congress did give the Chairman and the Commission discretion, within the IGRA's mandatory remedial framework, to determine what type of enforcement action is appropriate to the circumstances of a particular violation or substantial violation."  <u>Id.</u>

In <u>CACGEC</u>, though an order requiring NIGC to act ultimately issued, the basis and posture of the court's decision was vastly dissimilar from the instant case.  The order resulted from a successful challenge under the APA, which acted to waive sovereign immunity, rested on a distinct factual predicate, and was issued pursuant to the All Writs Act, 28 U.S.C. § 165(a), "in aid" of the court's jurisdiction.  <u>See</u> <u>Clinton v. Goldsmith</u>, 526 U.S. 529, 535 (1999) ("While the All Writs Act authorizes employment of extraordinary writs, it confines the authority to the issuance of process in aid of the issuing court's jurisdiction. . . . [It] does not enlarge that jurisdiction.").  The court found as follows:  (1) "IGRA mandates that the NIGC take prompt action once it has reason to believe that a violation exists;" (2) "operating a gaming facility absent the Chairman's approval of a gaming ordinance is unlawful and a substantial violation of the IGRA;" (3) "*the Court's July 8, 2008 Decision vacated the Chairman's approval of the [Tribe's] Ordinance*;" (4) "Defendants do not

dispute that the SNI has been operating a gaming facility on the Buffalo Parcel without an approved ordinance since July 8, 2008;" (5) "IGRA's mandate to the NIGC provides authority to issue a writ in aid of the Court's exercise of its jurisdiction in CACGEC II;" and (6) "An order compelling the NICG and its Chairman to carry out their congressionally-mandated obligations in the face of the Court's July 8, 2008 Decision vacating the Chairman's Ordinance approval appears to be precisely the type of action contemplated by the All Writs Act." CACGEC, 2008 U.S. Dist. LEXIS 67743, at *13-14 (emphasis added).

It is apparent from the court's very summary of its finding why CACGEC cannot support Plaintiffs' case. The plaintiffs in that action properly brought a challenge to the approval of a gaming ordinance under the APA and obtained an order vacating that approval; the NIGC took no action thereafter, and the prevailing plaintiffs sued to enjoin the continued operation of the casino under the vacated ordinance.  Given these facts, the Court found that the mandatory aspect of the IGRA enforcement was triggered, as the NIGC necessarily knew of unlawful activity under IGRA. Critically, the plaintiffs in CACGEC were not launching a direct attack on the defendants' action or inaction under IGRA, but had proceeded in a timely fashion under the APA; thus, the plaintiffs were not merely attempting to compel enforcement of IGRA but were effectuating their successful action under the APA.  Accordingly, the court's order pursuant to the All Writs Act, 28 U.S.C. § 165(a) expressly did not expand the court's jurisdiction or find sovereign immunity to be waived because of the existence of a non-discretionary duty.  While this Court does not necessarily endorse the reasoning or the result in CACGEC, the basis of the CACGEC court's decision illustrates why that case provides no support for Plaintiffs' claim.

In contrast to the facts and posture of CACGEC, Plaintiffs never proceeded in a timely

manner under the APA to challenge the operation of the Turning Stone Casino.  Nor did they ever

obtain an order finding violations of IGRA.  Rather, Plaintiffs allege they "have on a number of

occasions requested the Defendants to act on the illegal gambling occurring at the Turning Stone

Casino," and they imply that this should be sufficient to trigger mandatory enforcement action under

IGRA.  This Court has no doubt that such allegations are patently inadequate to compel agency

action, as IGRA requires that the NIGC need take action only when "the Commission has reason to

believe" there are ongoing violations of the statute.  25 U.S.C. § 2713(a)(3).  It is untenable that the

mere submission of requests by Plaintiffs to the NIGC would meet this standard.  Thus, Plaintiffs

cannot show the prerequisites for a writ of mandamus, in that there is no established, non-

discretionary duty at the center of their claim and they cannot show a right to the relief they seek.  In

other words, since Plaintiffs have not obtained a judgment in their favor, as the CACGEC plaintiffs

did under the APA, they are simply not entitled to an order mandating officials to act in someway

based on the Plaintiffs' plain assertions.

In essence, Plaintiffs' mandamus claim seeks to assert a private right of action under IGRA

and to simultaneously obtain the injunctive relief that might be afforded after a favorable judgment.

It is settled, however, that IGRA does not contain any private right of action, and citizen challenges,

to the extent they are permissible, arise through the APA.  See, e.g., Florida v. Seminole Tribe of

Florida, 181 F.3d 1237, 1249 (11th Cir. 1999); Hein v. Capitan Grande Band of Dieguéno Mission

Indians, 201 F.3d 1256, 1260 (9th Cir. 2000); Hartman v. Kickapoo Tribe Gaming Comm'n, 319

F.3d 1230, 1232 (10th Cir. 2003); 25 U.S.C. § 2714.  Courts have noted that the "legislative history

of IGRA indicates that Congress, in developing a comprehensive approach to the controversial

subject of regulating tribal gaming, struck a careful balance among federal, state, and tribal interests.

. . [and that it] would frustrate this intent--and upset the carefully-struck congressional balance . . . [to] recogniz[e] an implied right of action under IGRA . . ." Seminole, 181 F.3d at 1248.  "Although Congress did provide that certain decisions by the NIGC made under various provisions of IGRA are subject to federal court review under the Administrative Procedures Act. . . nowhere does IGRA expressly authorize private individuals to sue directly under the statute for failure of a tribe, a state, or the NIGC to comply with its provisions."  Furthermore, IGRA contains express causes of action in favor of tribes, states, and the federal government for certain violations.  See, e.g., 25 U.S.C. §§ 2710, 2711, 2714.  The presence of these causes of action, particularly in light of the sensitive balancing of interests involved in IGRA, has indicated that Congress did not intend there to be any implied private right of action in favor of an individual seeking to enforce compliance.  See AMTRAK v. Nat'l Assoc. of R.R. Passengers, 414 U.S. 453, 458 (1974) ("when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies").

        Plaintiffs attempt an end-run around this bar on private actions under IGRA by bringing their claim pursuant to the mandamus statute.  But Plaintiffs are unable to establish two of the underlying requirements of a writ of mandamus, namely that a clear duty be owed and that Plaintiffs have a clear right to the relief they seek.  Moreover, because there is no private right of action under IGRA, and Plaintiffs have not sought timely review pursuant to 25 U.S.C. § 2714, there is no avenue for Plaintiffs to ever secure a clear right to the relief they wish to obtain.  Stated differently, Plaintiffs' Seventh Claim provides no basis for the Court to order that Defendants commence any enforcement action under IGRA.  Accordingly, the claim is dismissed.

**F.  Eighth Claim**

In their Supplemental Complaint, Plaintiffs advance an Eighth Claim, challenging the transfer of 18 acres of excess federal land from the GSA to the DOI, which acknowledged administrative custody over the land on December 30, 2008 and accepted it into trust on behalf of the OIN.  The land in question, previously an annex to the Griffiss Air Force Base, was turned over to the DOI by the GSA pursuant to the requirements of 40 U.S.C. § 523.  Plaintiffs articulate their attack in several ways: that the provision mandating the transfer is inapplicable to the OIN; that the United States cannot take such action without the consent of New York State; that the DOI has failed to comply with procedures because the transfer was not mandatory and failed to comply with other procedures even if the transfer is found to be mandatory; and that the federal government generally does not have authority to take the land into trust.  Defendants move to dismiss the claim in its entirety.  The Court finds that the Eighth Claim must be dismissed, as each of Plaintiffs' arguments is without merit.

The statute requiring the challenged transfer provides, in relevant part:

> The Administrator of General Services *shall* prescribe procedures necessary to transfer to the Secretary of the Interior, without compensation, excess real property located within the reservation of any group, band, or tribe of Indians that is recognized as eligible for services by the Bureau of Indian Affairs . . . . [T]he Secretary shall hold excess real property transferred under this section in trust for the benefit and use of the group, band, or tribe of Indians, within whose reservation the excess real property is located.

40 U.S.C. § 523 (emphasis added).  In other words, any excess real property within the borders of a recognized Indian tribe must be transferred to the Secretary to be held in trust for the benefit of that Indian group.  Section 523 thus mandates that tracts of land shall be transferred from one federal agency to another federal agency if they meet certain qualifications.

27

Plaintiffs' challenge to the DOI's acknowledgment of administrative custody fails for several reasons.  First, Plaintiffs lack of standing.  "[T]he threshold issue of standing [is] 'an essential and unchanging part of the case-or-controversy requirement of Article III.'"  Horne v. Flores, ___ U.S. ___, 129 S. Ct. 2579, 2592 (2009) (quoting Defenders of Wildlife, 504 U.S. at 560 (1992)).  The constitutional minimum for standing to sue includes demonstrating: an injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest;' causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief.  W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP, 549 F.3d 100, 106-07 (2d Cir. 2008) (citing Defenders of Wildlife, 504 U.S. at 560-61).

Plaintiffs fail to allege an injury-in-fact that is actually caused by the challenged action sufficient to demonstrate their standing to challenge the government's disposition of its real property. Indeed, Plaintiffs simply do not indicate how the DOI's acceptance of custody of land which has been transferred from a different federal agency and owned by the federal government for decades inflicts any harm upon a legally protected interest they possess.  Plaintiffs seek to clarify that their injury is that they "will be exposed to and injured by the negative effects of operating trust land and a massive illegal casino in their community" as well as "other negative environmental, health, economic and social consequences that are attendant by the proposed action and eventual development and use of the subject lands," including harm to "the value of [Plaintiffs'] properties." Response at 8 (quoting Supplemental Complaint).  The fault in Plaintiffs' allegations is that these harms, assuming they state valid injuries-in-fact, are simply not the result of the § 523 transfer; rather, they are entirely speculative lists of harms that might flow from speculative events about

which Plaintiffs do not allege any facts that would suggest their occurrence is immediate and likely.

In essence, Plaintiffs seek to base their claim on the mere notion that transferring land from one

federal agency to another agency to be held in trust for the OIN causes the Plaintiffs a cognizable

injury.  Their allegations, however, cannot support such a claim.

Second, Plaintiffs' claim fails because there has been no waiver of sovereign immunity for

the suit they bring, and, hence, this Court does not have subject matter jurisdiction over the claim.

See United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may

not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

The Quiet Title Act of 1972, 28 U.S.C. § 2409a, provides "the exclusive means by which adverse

claimants could challenge the United States' title to real property."  Block v. North Dakota, 461 U.S.

273, 287 (1983).  Absent the applicability of a waiver of sovereign immunity as allowed for by the

Quiet Title Act, any challenge to titles or interests in land held by the United States is barred.  Per

Congress' express instructions, the Act "does not apply to trust or restricted Indian lands," thus

definitively excluding this type of challenge from those to which the United States consents.  28

U.S.C. § 2409a(a).  The Supreme Court left no doubt about the meaning of this point, holding that

the language "operates solely to retain the United States' immunity from suit by third parties

challenging the United States' title to land held in trust for Indians."  United States v. Mottaz, 476

U.S. 834, 842 (1986).  "Thus, when the United States claims an interest in real property based on that

property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the

Government's immunity."  Id. at 843.  Plaintiffs seek to do precisely what is disallowed by the Quiet

Title Act in bringing a challenge to the DOI's acceptance of land into trust for the OIN that the

federal government has held in fee. Plaintiffs' attempt to frame their claim, at least in part, as an

APA challenge does not overcome the sovereign immunity issue.  The APA makes clear that "[n]othing herein . . . (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702; see also Block, 461 U.S. at 286 (indicating that the APA does not waive sovereign immunity as to actions within the ambit of the Quiet Title Act.).  Accordingly, Plaintiffs' claim is barred and, therefore, dismissed.

Finally, Plaintiffs' claim is dismissed for failing to state a claim.  They predicate much of their Eighth Claim argument on the assertion that the OIN reservation is disestablished, such that the OIN may not have land taken into trust on their behalf under § 523.  However, as the Court explained, *supra*, in analyzing Plaintiffs' Fourth and Fifth Claims, this argument is without merit and contradicts governing Second Circuit precedent.  See Oneida Indian Nation, 337 F.3d 139, 160-67, rev'd on other grounds, Sherrill, 544 U.S. 197, 216.  The OIN remain a federally recognized tribe, and Congress has not disestablished their reservation.  Plaintiffs' claim that § 523 cannot apply to the OIN is unfounded.  For the foregoing reasons, Plaintiffs' challenge to the 18 acre transfer is dismissed.

## III.    CONCLUSION

Accordingly, it is hereby

**ORDERED**, that Defendants' Motion for partial dismissal of claims (Dkt. No. 23) is **GRANTED** in its **ENTIRETY**, and it is further

**ORDERED**, that Plaintiffs' (a) non-delegation claim, (b) IGRA compliance claim, (c) gaming compact claim challenging Defendant Cason's June 13, 2007 letter, (d) claim challenging the

NIGC's 1994 approval of the gaming compact, and (e) claim seeking to enjoin Defendant officials to

take enforcement actions pursuant to IGRA are **DISMISSED**, and it is further

ORDERED, that Defendants Phillip N. Hogan, the NIGC and Eric Holder are **DISMISSED**,

as no claims remain against these parties, and it is further

ORDERED, that Defendants' Motion to dismiss Plaintiffs' Supplemental Claim (Dkt. No.

45) is **GRANTED** in its **ENTIRETY**, and it is further

ORDERED, that Plaintiffs' claim challenging the transfer by the GSA of 18 acres and the

DOI's acceptance of that land into trust, pursuant to § 523, is **DISMISSED**, and it is further

ORDERED, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**


DATED:          March 04, 2010
                Albany, New York


Lawrence E. Kahn
U.S. District Judge