UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UPSTATE CITIZENS FOR EQUALITY,
INC.; DAVID VICKERS; RICHARD
TALLCOT; SCOTT PETERMAN; and
DANIEL T. WARREN,

                    Plaintiffs,

          -against-                                    5:08- cv-0633 (LEK/DEP)

SALLY M. R. JEWELL, in her official
capacity as Secretary of the U.S.
Department of the Interior; MICHAEL
L. CONNOR, in his official capacity as
Deputy Secretary of the Interior;
ELIZABETH J. KLEIN, in her official
capacity as Associate Deputy Secretary of
the Department of the Interior;[1] the
UNITED STATES OF AMERICA; and
the UNITED STATES DEPARTMENT
OF THE INTERIOR,

                    Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

          Plaintiffs Upstate Citizens for Equality, Inc. ("UCE"), a non-profit corporation; and a

number of UCE's officers, Richard Tallcot, Daniel T. Warren, Scott Peterman, and David Vickers

(collectively, "Plaintiffs"), commenced this action to challenge a May 20, 2008, Record of Decision

issued by Department of the Interior ("DOI") taking over 13,000 acres of land in Central New York

into trust for the benefit of the Oneida Indian Nation of New York ("OIN" or the "Nation").  Dkt.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sally M. R. Jewell is substituted as
Secretary of the Interior; Michael L. Connor is substituted as Deputy Secretary; and Elizabeth J.
Klein is substituted as Associate Deputy Secretary.

Nos. 1; 35 ("Complaint"). Presently before the Court is Defendants' Motion for summary judgment. Dkt. Nos. 79 ("Motion"); 79-1 ("Memorandum"). Plaintiffs have filed a Response and Defendants, in turn, have filed a Reply. Dkt. Nos. 80 ("Response"); 81 ("Reply"). For the following reasons, Defendants' Motion is granted.

## II.    BACKGROUND

### A.  Legal Framework

The Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C.§ 461 *et seq*., was the centerpiece of New Deal Indian policy, which sought to enable tribes "to interact with and adapt to modern society as a governmental unit," and repudiated an era in which federal Indian policy had encouraged cultural assimilation. F. Cohen, Handbook of Indian Law § 1.05, at 81 (Newton ed. 2012). The IRA ended allotment, see General Allotment Act of 1887, 24 Stat. 388, where tribal lands had been broken up and distributed to individual Indians, and instead "facilitat[ed] tribes' acquisition of additional acreage and repurchase of former tribal domains," Handbook of Indian Law § 1.05, at 81.

To that end, § 5 of the IRA empowers the Secretary of the DOI (the "Secretary") to acquire land in trust for Indian tribes, such that the land is exempt from state and local taxation. 25 U.S.C. § 465. A tribe is qualified to have land taken into trust under § 5 if they meet the IRA's definition of "Indian," which includes, *inter alia*, "all persons of Indian descent who are members of any recognized tribe now under Federal jurisdiction." 25 U.S.C. § 479. DOI has promulgated regulations at 25 C.F.R. Part 151, which establish procedures for the acquisition of land in trust under § 5. These include criteria the Secretary must consider in making an acquisition, depending on whether the acquisition is on-reservation, 25 C.F.R. § 151.10, or off-reservation, id. § 151.11.

**B. Factual Background**

"OIN is a federally recognized Indian Tribe and a direct descendant of the Oneida Indian Nation," which historically occupied what is now central New York, although the tribe's land holdings and population have fluctuated significantly over time. City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y., 544 U.S. 197, 203 (2005). On April 4, 2005, OIN submitted a request to DOI under § 5 of the IRA requesting that the Secretary acquire approximately 17,370 acres in Madison County and Oneida County, New York into trust status for OIN.[2] Dkt. No. 57-4 ("ROD") at 6. The request comprised properties that were reacquired by OIN in open-market transactions, two centuries after they had last been possessed by the Oneidas. Id. The land is the location of OIN's Turning Stone Resort & Casino ("Turning Stone"), a Class III casino under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq*.; various other commercial enterprises, such as gas stations and golf courses; and OIN's government and cultural facilities. ROD at 6. OIN intends to continue existing uses of the land. See id. at 8, 31.

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., DOI issued a draft Environmental Impact Statement ("EIS") regarding the proposed fee-to-trust request on November 24, 2006. Id. at 6. The purpose of the proposed action was "to help address the Nation's need for cultural and social preservation and expression, political self-determination, self-sufficiency, and economic growth." Id. at 8. Public comments were solicited until February 22, 2007, and public hearings were held on December 14, 2006, and February 6, 2008. Id. at 6-7. DOI issued its final EIS on February 22, 2008. Id. at 7.

---

[2] For further background on the history of OIN and the events leading to OIN's fee-to-trust request, see generally City of Sherrill, 544 U.S. 197.

In the final EIS, DOI analyzed the environmental and socioeconomic impacts of the proposed action—acquiring the full 17,370 acres requested in trust—and eight reasonable alternatives. Id. at 6-7. On March 20, 2008, DOI issued its decision to accept approximately 13,003.89 acres in trust for the Nation. Id. at 7. The selected alternative "reflects the balance of the current and short-term needs of the Nation to reestablish a sovereign homeland and the New York State and local government requests to establish a more contiguous and compact trust land grouping." Id. at 19. Under the selected alternative, 4,284 of the requested acres would not be placed into trust. Id. The selected lands are centered around Turning Stone in Oneida County and OIN's 32-acre territory in Madison County. Id.

### C. Procedural Background

Plaintiffs commenced this action on June 16, 2008, asserting a number of legal challenges under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.[3] The named Defendants are: Sally M. R. Jewell, United States Secretary of the Interior; Michael L. Connor, Deputy Secretary of the Interior; Elizabeth J. Klein, Associate Deputy Secretary of the Interior; the United States of America; and the United States Department of the Interior (collectively, "Defendants").[4] Id. ¶¶ 25-28.

---

[3] Several other parties also filed suit challenging the ROD. State of New York, et al. v. Salazar, et al., No. 6:08-cv-0644; City of Oneida v. Salazar, et al., No. 5:08-cv-0648; Town of Verona, et al. v. Salazar, et al., No. 6:08-cv-0647; Central New York Fair Business Association, et al., v. Salazar, et al., No. 6:08-cv-0660; and Niagra Mohawk Power Corp. v. Kempthorne, et al., No. 5:08-cv-0649.

[4] Defendants Philip N. Hogen, chairman of the National Indian Gaming Commission; the National Indian Gaming Commission; and Michael B. Mukasey, Attorney General of the United States were dismissed as Defendants in a Memorandum-Decision and Order dated March 4, 2010. Dkt. No. 49.

4

Plaintiffs' Complaint raises, *inter alia*, the following claims: (1) Defendants exceeded their statutory authority in deciding to acquire the land into trust under the IRA; (2) that § 5 of the IRA violates the non-delegation doctrine; (3) Defendants acted arbitrarily and capriciously because they failed to apply the appropriate criteria and consider the relevant factors; (4) Defendants' decision to acquire the land into trust was arbitrary and capricious because it was based on the assumption that gambling at Turning Stone was lawful under the IGRA; (5) the operation of Turning Stone violates the statutory procedures mandated by IGRA §§ 2710 and 2719; (6) a 2007 letter determining that DOI would not reconsider its approval of the 1993 gaming compact between OIN and New York State was arbitrary and capricious; and (7) a claim seeking a writ of mandamus, ordering Defendants to carry out their statutory duties. See generally Compl. Plaintiffs subsequently submitted an Amended Complaint, which challenged a separate decision by the General Services Administration on December 30, 2008, to transfer 18 acres from the former Griffiss Air Force Base to DOI to be held in trust for OIN. Dkt. No. 35.

Defendants filed a Motion for partial dismissal of Plaintiffs' claims and a Motion to dismiss Plaintiffs' supplementary claim. Dkt. Nos. 23; 45. On March 4, 2010, the Court granted Defendants' Motions in their entirety. Dkt. No. 49 ("2010 Memorandum-Decision and Order"). The Court dismissed "Plaintiffs' (a) non-delegation claim, (b) IGRA compliance claim, (c) gaming compact claim challenging Defendant Cason's June 13, 2007 letter, (d) claim challenging NGIC's 1994 approval of the gaming compact, and (e) claim seeking to enjoin Defendant officials to take enforcement actions pursuant to the IGRA." Id. at 30-31. The Court also dismissed Plaintiffs' supplementary claim. Id. at 31.

On November 15, 2011, Defendants moved for summary judgment on the remaining claims

5

in Plaintiffs' Complaint.  Dkt. No. 57.  On the same date, Plaintiffs filed a letter motion for

summary judgment.  Dkt. No. 58.  A newly central issue raised in Plaintiffs' challenge to the ROD

was whether OIN was eligible to have land taken into trust under the IRA in light of the Supreme

Court's recent decision in Carcieri v. Salazar, 555 U.S. 379 (2009).  In Carcieri, the Supreme Court

determined that the word "now" in the definition of "Indian" in the IRA—"all persons of Indian

descent who are members of any recognized Indian tribe now under Federal jurisdiction"—meant

the date of the IRA's enactment in 1934.  Carcieri, 555 U.S. at 381.  Thus, to be eligible to have

land taken into trust under the IRA, a tribe must have been under federal jurisdiction in 1934.  Since

Carcieri had not been addressed in the ROD, the Court issued a Memorandum-Decision and Order

dated September 24, 2012, denying all motions for summary judgment across the related cases, and

remanding to DOI to establish a record and determine in the first instance whether OIN was under

federal jurisdiction in 1934.  Dkt. No. 65.

On February 19, 2014, after the parties had an opportunity to submit evidence for DOI to

consider, DOI filed an Amendment to the ROD applying Carcieri to OIN, consistent with the

Court's remand.  Dkt. No. 76-1 ("Opinion").  The Opinion concluded that OIN "was under federal

jurisdiction in 1934 because the Oneidas voted in an election called and conducted by the Secretary

of the Department of the Interior pursuant to Section 18 of the IRA on June 18, 1936."  Id. at 3.  The

Opinion determined that while the vote alone was sufficient, there were a number of other federal

actions which, "either in themselves or taken together," establish that OIN was under federal

jurisdiction in 1934.  Id.

On March 7, 2014, Defendants again moved for summary judgment on the remaining claims

in Plaintiffs' Complaint.  Mot.

### III.  LEGAL STANDARD

#### A.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The movant bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the movant claims will demonstrate the absence of a genuine issue of a material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  If the movant has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c).  This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

"The question whether an agency's decision is arbitrary and capricious . . . is a legal issue," and is thus, "amenable to summary disposition."  Noroozi v. Napolitano, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting Citizens Against Casino Gambling in Erie Cnty. v. Stevens, 945 F. Supp. 2d 391, 399 (W.D.N.Y. 2013)).  "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The entire case on review is a question of law."  State of Conn. v. U.S. Dep't. of Commerce, No. 04-cv-1271, 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007) (citing Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001)); see also James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking,

district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions.").

## B. Administrative Procedure Act

Under the APA, a district court may set aside an agency's findings, conclusions of law, or actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In reviewing agency action, [a][c]ourt may not 'substitute its judgment for that of the agency.'" Natural Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Rather, a reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Nat'l Ass'n of Homebuilders v. Defenders of Wildlife, 551 U.S. 664, 658 (2007) (internal quotations and citations omitted).

Nevertheless, a reviewing court's "inquiry must be searching and careful." Natural Res. Def. Council, Inc. v. FAA, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks and citations omitted). An agency decision may be deemed arbitrary and capricious if the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n of U.S., Ind. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Yale New Haven Hosp. v. Leavitt, 470 F.3d 71, 79 (2d Cir. 2006).

Further, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1491 (D.C. Cir. 1995)); see also Islander East Pipeline Co., LLC v. McCarthy, 525 F.3d 141, 151 (2d Cir. 2008) ("This is not to suggest that judicial review of agency action is merely perfunctory. To the contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful.") (internal quotation marks and citations omitted). In order for an agency's decision to survive judicial review, the agency must have articulated "a rational connection between the facts found and the choice made." Henley v. FDA, 77 F.3d 616, 620 (2d Cir. 1996) (internal quotation marks omitted).

## IV. DISCUSSION

Defendants move for summary judgment on the following claims remaining in Plaintiffs' Complaint: (1) DOI lacks authority to create federal land in New York State on the basis of federalism principles; (2) the Indian Commerce Clause does not authorize the removal of land from a state's sovereign control; (3) the IRA does not apply to OIN because the Oneidas voted to reject the Act's application and the IRA only applies to lands that were subject to allotment; (4) OIN's fee-to-trust application was not properly before DOI because Raymond Halbritter ("Halbritter") is not the legitimate leader of OIN; (5) the Bureau of Indian Affairs ("BIA") is institutionally biased in favor of Indian tribes and ignored UCE's comments; (6) DOI incorrectly applied the on-reservation regulations, rather than the off-reservation regulations; and (7) DOI failed to consider the requisite regulatory criteria.

**A. Carcieri**

The Court first addresses the extent to which Plaintiffs have made a claim premised on Carcieri. Plaintiffs have stated that the Oneidas were under State jurisdiction, Compl. ¶¶ 55-57, and that the Oneidas have only ever had a State reservation, Resp. at 14. Plaintiffs presented these arguments, *inter alia*, to DOI during the remand process. Op. at 39-40. The Court will consider these arguments insofar as they challenge DOI's conclusion that the Oneidas were under federal jurisdiction in 1934.

*1. State Jurisdiction and Reservation*

Plaintiffs claim that the Oneidas, in the 1788 Treaty of Fort Schuyler, ceded all of their lands to the State of New York and retained only a "state use right reservation." Compl. ¶ 37. Plaintiffs further claim that the Oneidas sold their "possessory interests" to the State from 1795 onward. Resp. at 14. Plaintiffs deny that the 1794 Treaty of Canandaigua, 7 Stat. 44, created a federal reservation, and instead interpret that Treaty as "acknowledg[ing] the state reservation" created in the earlier Treaty of Fort Schuyler. Compl. ¶ 37; Resp. at 14. Based on the foregoing, Plaintiffs claim that the Oneidas have no reservation—State or federal—because they sold any rights they retained to the State. Resp. at 14.

Defendants rejected these arguments that on the ground that the Treaty of Canandaigua created a federal reservation, which has never been disestablished by Congress. Op. at 36-38. Defendants relied on the Second Circuit's holding in Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y., 337 F.3d 139, 165 (2d Cir. 2003), that the Oneida reservation has not been disestablished, which, as the Court has recognized, remains the law in the Second Circuit, New York v. Salazar, No. 08-cv-644, 2009 WL 3165591, at *8-9 (N.D.N.Y. Sept. 29, 2009) (Kahn, J.).

Defendants also considered related arguments that the Oneidas were under State jurisdiction. Defendants noted "confusion by some federal officials as to the interplay of state authority . . . vis-a-vis federal jurisdiction," Op. at 21, and that management of "Indian affairs had been left to the state," id. at 34. Defendants concluded, however, that any such confusion was belied by the record as a whole. Id. at 21. Defendants again relied on the Second Circuit's holdings in United States v. Boylan, 265 F. 165 (2d Cir. 1920) and Oneida Indian Nation, 337 F.3d 139, which recognized a federal OIN reservation and, implicitly, federal jurisdiction. See Op. at 18-19 ("State laws cannot change the status of either a federal reservation or a federally recognized tribe.").

The Court again acknowledges binding Second Circuit precedent that there is a federal OIN reservation that has not been disestablished. See Oneida Indian Nation, 337 F.3d at 165. Plaintiffs' argument that the Oneidas have remained under State jurisdiction, resp. at 14, fails because the Supreme Court determined in Oneida Indian Nation of N.Y. v. Oneida Cnty., N.Y., 414 U.S. 661 (1974) ("Oneida II"), that "[o]nce the United States was organized and the Constitution adopted, . . . tribal rights [of occupancy] to Indian lands became the exclusive province of the federal law," id. at 667. "The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land. This the United States did with respect to the various New York Indian Tribes, including the Oneidas." Id. Thus, it follows from Oneida II that the land "acknowledged" as "reserved to the Oneida" in the Treaty of Canandaigua was under the jurisdiction of federal law, and not state law. See id. at 670-71; see also Boylan, 265 F.3d at 171 ("[T]he exclusive federal jurisdiction over the [Oneidas] is in the federal government . . . even though the state of New York has legislated.").

### 2. Plaintiffs' Other Comments

Plaintiffs made several other comments during the remand regarding the lineage of OIN. First, Plaintiffs claimed that the Oneidas had ceased to exist as a tribe by 1934. Op. at 39. Defendants considered the "Reeves Report," which was prepared by the Chief Counsel in the Office for Indian Affairs in 1914, and documented the "absence" of the Oneidas in New York State. Id. at 33. Defendants, however, concluded that the Reeves Report was "not an accurate representation of the Oneidas' status in 1934." Id. Defendants found that statements from other DOI officials and federal actions—including the lawsuit the United States brought on the Oneidas' behalf in Boylan—were better evidence of the official Department view. Id. at 34. Judgments regarding a tribe's existence is a matter that is squarely in BIA's expertise, see, e.g., United Tribe of Shawnee Indians v. United States, 253 F.3d 543 (10th Cir. 2001), and the Court finds that Defendants reasonably weighed the conflicting evidence.

Plaintiffs also argued that the tribe the government recognized "may have been the Oneida Tribe of Wisconsin." Op. at 39. This assertion, however, is contradicted by all the evidence considered by Defendants, which concerns the Oneida groups in New York and their relations with the federal government. See, e.g., Op. at 34. Finally, Plaintiffs claimed that "there is no legitimate link between the Oneida Indian Nation of New York and the entity currently enjoying BIA recognition." Id. at 39 (quotation marks omitted). This argument also fails to state a claim against DOI's conclusion the Oneidas were under federal jurisdiction in 1934 because "the United States (including the Department) has officially recognized the OIN as a successor in interest to the historic Oneida Nation since treaty times." Id. at 25 n.168.

### B. Plaintiffs' Constitutional Arguments

In their Response, Plaintiffs broadly attack the constitutionality of the § 5 fee-to-trust

procedure. Resp. Specifically, Plaintiffs contend that § 5 violates principles of federalism implicit in the Constitution and exceeds Congress's authority under the Indian Commerce Clause. Resp. at 7-9. Plaintiffs are effectively making an argument under the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. A Tenth Amendment argument can be viewed as challenging congressional action as either exceeding delegated power, or as having "invade[d] the province of state sovereignty reserved by the Tenth Amendment." New York v. United States, 505 U.S. 144, 155 (1992).

The Court already rejected a Tenth Amendment challenge to § 5 in a related case and does so again here. Town of Verona v. Salazar, No. 08-cv-647, 2009 WL 3165556, at *2-4 (N.D.N.Y. Sept. 29, 2009) (Kahn, J.). Section 5 represents a valid exercise of congressional authority pursuant to the Indian Commerce Clause, which grants Congress the power "[t]o regulate commerce . . . with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has consistently interpreted Congress' authority to legislate in matters involving Indian affairs broadly. See, e.g., United States v. Lara, 541 U.S. 193, 200 (2004) (describing Congress' powers to legislate with respect to Indian matters as "plenary and exclusive"); South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."); Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs[.]") (citing Morton v. Mancari, 417 U.S. 535, 551-52 (1974)). Plaintiffs argue that the Indian Commerce Clause has limits, in the same way that the Interstate Commerce Clause has limits. See United States v. Lopez, 514 U.S. 549 (1995). However,

Plaintiffs' lone citation is a Justice Thomas concurrence. <u>Adoptive Couple v. Baby Girl</u>, 133 S. Ct. 2552, 2565-71 (2013) (Thomas, J., concurring). Given Congress' plenary authority in matters involving Indian affairs, the Court finds that the Secretary's determination to acquire land into trust for OIN pursuant to § 5 is a valid exercise of the power delegated Congress by the Constitution.

The case law Plaintiffs cite suggesting that the federal acquisition of sovereign state land offends principles of federalism is unavailing. Resp. at 7-8 (citing <u>Hawaii v. Office of Hawaiian Affairs</u>, 556 U.S. 163 (2009); <u>Idaho v. United States</u>, 533 U.S. 262 (2001); <u>Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.</u>, 313 U.S. 508 (1941)). None of the cited cases involve § 5 of the IRA. Rather, the cited cases involve land bestowed to a state at its admission to the union and later congressional action inconsistent with state sovereignty over those lands. <u>Hawaii</u>, 556 U.S. at 176 (finding that interpretation of congressional resolution would raise "grave constitutional concerns" where it would "cloud" Hawaii's title to sovereign lands three decades after Hawaii's admission to union); <u>Idaho</u>, 552 U.S. at 280 n.9 ("Congress cannot, after statehood, reserve or convey submerged lands that have already been bestowed upon a State.") (quotation omitted). The Secretary's acquisition of lands into trust within the OIN reservation is clearly a different situation. It is well established that trust acquisition does not negate state authority. <u>Nevada v. Hicks</u>, 533 U.S. 353, 361 (2001) ("Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation."). Thus, the Secretary's § 5 trust acquisition on behalf of OIN does not interfere with state sovereignty so as to create the "grave constitutional concerns" found by the <u>Hawaii</u> Court, 556 U.S. at 176.

The Court also notes Plaintiffs' Guarantee Clause argument. Resp. at 8-9. The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican

Form of Government." U.S. CONST. art. 4, § 4, cl. 1. Plaintiffs appear to claim that the Guarantee

Clause is violated because the trust acquisition deprives the Oneida Indians of a republican form of

government since the leadership of Halbritter "is of a non-democratic and decidedly non-republican

nature." Resp. at 9. This claim fails in the first instance because it is doubtful whether the

Guarantee Clause is justiciable. New York, 505 U.S. at 184 ("In most of the cases in which the

Court has been asked to apply the Clause, the Court has found the claims presented to be

nonjusticiable under the 'political question' doctrine."); see also Cnty. of Charles Mix v. U.S. Dep't

of Interior, 799 F. Supp. 2d 1027, 1037-38 (D.S.D. 2011) (finding Guarantee Clause challenge to

trust acquisition nonjusticiable). Assuming, arguendo, that the claim is justiciable, Plaintiffs have

not alleged that any "State" is deprived of a republican form of government, see New York, 505

U.S. at 144, nor do Plaintiffs—not being members of OIN—have standing to raise a claim regarding

the nature of OIN's government, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

### C. Application of the IRA to the Oneidas

Plaintiffs summarily assert that the IRA does not apply to OIN because: (1) OIN voted in

1936 to reject the application of the Act under § 18 and (2) the IRA only applies on lands that were

subject to allotment. Compl. ¶¶ 136-37. The first argument fails because Congress in the Indian

Land Consolidation Act ("ILCA"), 96 Stat. 2517, extended the benefits of the IRA to tribes that had

initially opted out of the Act by a § 18 vote. Section 2202 of the ILCA provides that "[t]he

provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of

section 478 of this title." 25 U.S.C. § 2202. In a related argument, Plaintiffs claim that OIN does

not meet the definition of "tribe" in the ILCA, because that definition is limited to tribes for which

the United States has held land in trust. Compl. ¶ 59. The Court rejected this argument in two

related cases and does so again here.  See New York v. Salazar, 2009 WL 3165591, at *13-15;

Town of Verona, 2009 WL 3165556, at *9-11.  Similarly, the Court has also already rejected the

argument that the IRA is limited to lands that were subject to allotment in related cases and does so

again here.  City of Oneida, N.Y. v. Salazar, No. 08-cv-0648, 2009 WL 3055274, at *5 (N.D.N.Y.

Sept. 21, 2009) (Kahn, J.).

### D.  State Consent

In group of arguments, Plaintiffs claim that State consent is necessary in order for the United

States to acquire land within the State.  Compl. ¶¶ 119, 142, 145.  Plaintiffs' claim appears to be

premised on the Enclave Clause, which provides that Congress may "exercise . . . Authority over all

Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the

Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. CONST. art.

1, § 8, cl. 17.  Courts, however, including this Court, have rejected Enclave Clause challenges to § 5

trust acquisitions.  See Carcieri v. Kempthorne, 497 F.3d 15, 40 (1st Cir. 2007), rev'd on other

grounds, 555 U.S. 379; Town of Verona, 2009 WL 3165556, at *3.  As explained above, the federal

government does not exercise exclusive jurisdiction over land held in trust on behalf of a tribe.

Nevada, 533 U.S. at 361; see also Surplus Trading Co. v. Cook, 281 U.S. 647, 651 (1930) (citing

Indian reservation as example of land that is not an enclave).

Plaintiffs further argue that New York has only consented to the United States acquiring

property in the open market under limited circumstances, which do not include taking land into trust

on behalf of a tribe.  Compl. ¶ 145 (citing N.Y. STATE LAW § 50).  However, § 50 only applies

where the State's consent is necessary.  State consent is necessary only where the United States will

acquire exclusive jurisdiction over the state property.  See United States v. Johnson, 994 F.2d 980,

16

984 (2d Cir. 1993) ("The federal government can only acquire jurisdiction over property [within a state] . . . if both state and federal governments agree to the transfer."). Thus, for the same reason Plaintiffs' Enclave Clause claim fails, Plaintiffs' reliance on New York State Law § 50 is also misplaced. See Nevada, 533 U.S. at 361.

### E. Plaintiffs' APA Claims

Plaintiffs' third count for relief consists of wide ranging allegations that Defendants' determination was arbitrary and capricious and without observance of procedures required by law under 5 U.S.C. § 706(2). Compl. ¶¶ 158-80.

#### 1. Legitimacy of Halbritter's Leadership of OIN

Plaintiffs claim that Defendants' acquisition of land into trust on behalf of OIN is arbitrary and capricious because the application was presented by Halbritter, as the leader of OIN, when in fact, Halbritter had been removed from that position "on or about May 21, 1995." Compl. ¶ 159. The events Plaintiffs rely on are recounted in Shenandoah v. U.S. Dep't of Interior, 159 F.3d 708, 710 (2d Cir. 1998). Plaintiffs' conclusory claim may be interpreted as either requesting that the Court determine the leadership of OIN, or as challenging BIA's recognition of Halbritter. Insofar as Plaintiffs request the former, the Court lacks subject matter jurisdiction over matters of a tribe's internal governance. See Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985). To the extent Plaintiffs challenge BIA's recognition of Halbritter, that claim is appropriately considered in the first instance by BIA. See Shenandoah, 159 F.3d at 712-13 (requiring challenge to BIA's recognition of Halbritter to be first exhausted before BIA); Runs After, 766 F.2d at 352. The claim is not appropriately presented to BIA in the context of a fee-to-trust determination. In addition, Plaintiffs lack standing to challenge Halbritter's leadership of OIN because Plaintiffs—who are not

members of OIN—cannot show that the purported illegitimacy of Halbritter's leadership has caused them an "injury in fact."  See Lujan, 504 U.S. at 560.

### 2. Plaintiffs' Comments and Institutional Bias of BIA

In similar claims, Plaintiffs allege that DOI did not consider their comments and that BIA is generally biased in favor of Indian tribes.  Compl. ¶¶ 160-62.

"[A]n agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, . . . stating its response in the final statement."  40 C.F.R. § 1503.4(a).  Furthermore, "[t]he agency shall discuss at appropriate points in the final statement any responsible opposing view."  Id. § 1502.9.  The record demonstrates that DOI considered and responded to Plaintiffs' comments, to the extent that they were relevant.  See, e.g., Final EIS, App. M at 291-93, AR010877-79,[5] (UCE comment letter dated December 14, 2006 and BIA responses); Final EIS, App. M at 823-37, AR029681-95 (noting UCE comment letter dated December 27, 2006); ROD, App. B at 223-28, AR005322-27 (UCE comment letters challenging constitutionality of fee-to-trust process).  Although "there must be good faith, reasoned analysis in response" to opposing viewpoints, "an agency's obligation to respond to public comment is limited" and "[n]ot every comment need be published in the final EIS."  California v. Block, 690 F.2d 753, 773 (9th Cir. 1982) (internal quotation omitted).  The Court finds that DOI adequately considered Plaintiffs' comments in the final EIS and ROD.  See Final EIS, App. M at 291-93, AR010877-79 (responding to UCE's contentions, *inter alia*, that § 5 of the IRA violates the non-delegation doctrine, that OIN is an "unconstitutional entity," and that the trust acquisition violates state sovereignty).

---

[5] The administrative record was filed with the Court on disks.  Dkt. No. 54.

"The Department of Interior's review of an application to take land in trust is subject to the due process clause and must be unbiased." South Dakota v. U.S. Dep't of Interior, 401 F. Supp. 2d 1000, 1011 (D.S.D. 2005). However, "a presumption of regularity attaches to the actions of Government agencies," U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001), and the party asserting bias bears the burden of proof, Schweiker v. McClure, 456 U.S. 188, 196 (1982). Plaintiffs' general allegation that BIA "only represents the interests of the Indian tribe" is effectively a claim that the policies established by Congress in the IRA create structural bias in favor of Indians. The Court finds that Congressional polices cited by Plaintiffs—which have been approved by the Supreme Court, e.g., Morton, 417 U.S. at 554-55—are insufficient to establish structural bias. See South Dakota, 401 F. Supp. 2d at 1011 ("Following Congress's statutory policies does not establish structural bias.").

### 3. On- and Off-Reservation Regulations

DOI has established different regulations applicable to "on" and "off" reservation trust acquisitions. 25 C.F.R. §§ 151.10, 151.11. The off-reservation regulations require the Secretary to give "greater scrutiny to the tribe's justification of anticipated benefits," and "greater weight" to the jurisdictional concerns of local governments. Id. § 151.11(b). Plaintiffs claim that the Secretary incorrectly applied the on-reservation regulations. Compl. ¶¶ 163-65.

An acquisition is considered "on-reservation," when "the tribe is recognized by the United States as having governmental jurisdiction" over the area of land. 25 C.F.R. § 151.2(f). Plaintiffs argue that the Supreme Court's holding in City of Sherrill that OIN "cannot unilaterally reassert sovereign control" over the lands in question means that OIN does not have governmental jurisdiction over those lands. Compl. ¶¶ 163, 167. The City of Sherrill Court, however, clearly

distinguished between questions of right and questions of remedy; its holding was that equitable considerations bar OIN from reasserting sovereign control. See City of Sherrill, 544 U.S. at 213-14. The City of Sherrill Court reserved judgment on whether the Oneidas' reservation still exists, 544 U.S. at 215 n.9, and as the Court has acknowledged, it remains the law in the Second Circuit that the OIN reservation has not been disestablished, see New York, 2009 WL 3165591, at *8-9. Thus, the United States does recognize OIN as having governmental jurisdiction over the land in question, and, accordingly, DOI correctly applied the on-reservation regulations.

### 4. Regulatory Factors

Plaintiffs allege that DOI did not adequately consider certain of the requisite regulatory criteria under 25 C.F.R. § 151.10.

### a. Statutory Authority

Section 151.10(a) requires the Secretary to consider "[t]he existence of statutory authority for the acquisition." Plaintiffs claim that "there is no valid statutory authority for Defendants to take the land into trust." Compl. ¶ 172. This claim is premised on Plaintiffs' constitutional challenges to the IRA, and since the Court has already rejected those challenges, this claim also fails. See also ROD at 33-34 (discussing statutory authority for trust acquisition).

### b. OIN's Need for Land

Section 151.10(b) requires the Secretary to consider "[t]he need of the individual Indian or the tribe for additional land." Plaintiffs claim that DOI did not adequately consider OIN's need for the land and that the acquisition will make OIN "wealthy at the expense of the surrounding non-Indian communities." Compl. ¶ 173. DOI did, in fact, consider comments that OIN is a financially secure tribe and would therefore have its needs met by continuing as a private landowner. ROD at

36. DOI noted, however, that "a demonstration of necessity may take into account more than economic need." Id. DOI determined that acquiring the land in trust was important because of the antagonistic relationship between OIN and State and local governments; DOI concluded that so long as OIN is a private landowner, it will continue to face litigation. Id. Acquiring the land in trust would enable OIN to continue existing uses of its lands, and thereby promote tribal self-determination and economic development; it would help "address the Nation's current and near-term needs to permanently reestablish a sovereign homeland for its members." Id.

The Court finds that DOI reasonably weighed OIN's need for the land to be held in trust. See South Dakota v. U.S. Dep't of Interior, 423 F.3d 790, 801 (8th Cir. 2005) ("It [is] sufficient for the Department's analysis to express the Tribe's needs and conclude generally that the IRA purposes were served."). DOI adequately responded to Plaintiffs' objection in the ROD.

### c. Removal of Land from Local Tax Rolls

Section 151.10(e) requires the Secretary to consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls." Plaintiffs claim that DOI "failed to adequately consider the loss of taxes actually assessed and paid on the property as required." Compl. ¶ 179.

Contrary to Plaintiffs' assertion, DOI thoroughly analyzed the impact of the trust acquisition on the tax rolls of each affected jurisdiction. ROD at 40-55. While finding that § 151.10(e) only required analysis of tax impacts "based on existing circumstances, i.e., taxes actually assessed and paid," and did not require speculation "on the outcome of the pending litigation between the Nation and the Counties over taxes," id. at 41, DOI also evaluated the tax impacts in the event that the Counties do prevail in that tax litigation, id. at 45. Defendants concluded that, "based on taxes

actually assessed and paid," the benefits of the acquisition to OIN outweighed the tax impacts on local governments.  Id. at 50.  Defendants' analysis further balanced lost tax revenue against the economic and tax benefits produced by OIN's business activities, and found that the net economic impact on almost every jurisdiction was positive, even assuming, *arguendo*, that OIN does not prevail in the ongoing tax litigation.  Id. at 49-50.  Considering the foregoing, Defendants ultimately concluded that the impact of removing the land from the tax rolls was not significant when balanced with the benefits to OIN.  Id. at 50.

The Court finds that this discussion is sufficient to meet DOI's obligation under § 151.10(e) to consider the impact on local tax rolls.  Plaintiffs' assertion that DOI did not consider the "loss of taxes actually assessed and paid on the property," is belied by the ROD, which shows that DOI did consider the loss of taxes actually assessed and paid, and took account of the uncertainties regarding the pending tax litigation.

### d.  Tax Liens

Plaintiffs challenge the ROD's compliance with § 151.13, which requires the Secretary, upon the determination to acquire land into trust, to require "title evidence."  If the Secretary discovers any "liens, encumbrances, or infirmities," she may require "the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition."  Id.

Given the uncertainty of the pending tax litigation, DOI required OIN "to provide a letter of credit to the United States for the difference between (a) the total taxes and related charges levied on the casino tax lot as of the date of formal acceptance and (b) the amount that the Nation paid or guaranteed through a letter of credit to the taxing jurisdiction."  ROD at 54.  "The purpose of the letters of credit . . . is to provide assurances that revenues will be paid over to the Counties *if and*

*when* taxes are judicially determined to be due and owing." Id.

Defendants argue that Plaintiffs do not have standing to challenge DOI's compliance with its title examination provisions. Mot. at 47. The Court agrees. Article III standing requires that a plaintiff has (1) suffered an injury-in-fact, that (2) is caused by the conduct complained, and would be (3) redressed by a favorable decision. Lujan, 504 U.S. at 560-61. Plaintiffs lack standing because they are unable to show that DOI's title examination process caused their injuries. The language of § 151.13 makes clear that title examination is separate from the Secretary's determination to take land into trust; title examination occurs "[*i*]*f* the Secretary determines that he will approve a request for the acquisition of land." 25 C.F.R. § 151.13 (emphasis added). Although title examination occurs prior to final approval action on the acquisition, see id. § 151.12(b), it is not a factor that the Secretary considers in making a trust decision under either § 151.10 or § 151.11. Plaintiffs' alleged injuries are caused by the decision to acquire the land into trust, and not by the title examination procedures. Compl. ¶ 18. Plaintiffs therefore lack standing to challenge DOI's requirement of letters of credit.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 79) for summary judgment on all remaining claims is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 26, 2015
            Albany, NY

Lawrence E. Kahn
U.S. District Judge